**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

---------------------------------------------------------

**FEMHEALTH USA, INC., d/b/a CARAFEM,**

Plaintiff,

v.

                                   CAUSE NO. 3:22-cv-00565

**RICKEY NELSON WILLIAMS, JR.;**
**BEVELYN Z. WILLIAMS; EDMEE**
**CHAVANNES; OPERATION SAVE AMERICA;**
**JASON STORMS; CHESTER GALLAGHER;**
**MATTHEW BROCK; COLEMAN BOYD;**
**FRANK "BO" LINAM; BRENT BUCKLEY;** and
**AJ HURLEY**,

Defendants.

---------------------------------------------------------

       Defendants Operation Save America, Jason Storms, Matthew Brock, Coleman Boyd, Frank "Bo" Linam, and Brent Buckley, by and through counsel, submit this response in opposition to Plaintiff Femhealth USA, Inc. d/b/a carafem's ("carafem") motion for preliminary injunction. As grounds, these Defendants state:

**I.      Standard of Proof.**

       "A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Am. C.L. Union of Kentucky v. McCreary Cnty., Kentucky*, 354 F.3d 438, 444 (6th Cir. 2003), aff'd sub nom. *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir.1986) (citation omitted), and citing *Detroit Newspaper Publishers. Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir.1972)

(emphasizing that a preliminary injunction is the strong arm of equity which should not be extended to cases which are doubtful or do not come within well-established principles of law)). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

The four factors to the considered in deciding a motion for preliminary injunction are well established in this District:

> The Court considers four factors in deciding a motion for preliminary injunction under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to the opposing party or others; and (4) whether the public interest would be served by the issuance of the injunction. Daunt v. Benson, 956 F.3d 396, 406 (6th Cir. 2020) (citing Bays v. City of Fairborn, 668 F.3d 814, 818–19 (6th Cir. 2012)); see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

*Doe #11 v. Lee*, __ F.3d __, No. 3:22-CV-00338, 2022 WL 2181800, at *6 (M.D. Tenn. June 16, 2022). "Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Patel v. AR Grp. Tennessee, LLC*, No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020). Carafem relies on just such 'scant evidence' here and fails to satisfy its burden on each of the four factors as against these Defendants.

Perhaps most critically, carafem wholly fails to establish irreparable harm in light of the fact that (a) these Defendants never violated the Freedom of Access to Clinic Entrances Act, 18

2

U.S.C. §248 ("FACE") in the first place[1], (b) they have no intention to return to carafem any time in the near future, and (c) there is no longer a constitutional right to abortion and thus any harm to carafem is legal, not equitable. Carafem's motion thus fails from the start. Although in this circuit district courts generally weigh the strength of the four factors against one another in something of a balancing test, "the second factor—irreparable injury absent the injunction—*must* be present in order for the Court to issue the requested preliminary injunction." *Doe #11 v. Lee*, 2022 WL 2181800, at *7 (emphasis in original) (citing *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019) ("[E]ven the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.' That factor is indispensable: **If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit.**") (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "[T]he existence of an irreparable injury is mandatory." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d at 327. Carafem's motion fails.

## II.     Carafem Fails to Demonstrate Likelihood of Success on the Merits.

During the week of July 23-30, 2022, these Defendants came to the Nashville area for Operation Save America's national event, "Foundations of Freedom." *See* [OSA National Event "Foundations of Freedom", Nashville, Tennessee July 23rd-30th (Details TBD) - Operation Save America](#). They came not to obstruct, or even to reach out to abortion-minded women, but to celebrate what they thought was the end of abortion in Tennessee. While here, they engaged in constitutionally protected expressive activities on the public sidewalks and public ways,

---

[1] In its Amended Complaint – filed only after its motion for preliminary injunction was filed and a hearing thereon was calendared -- carafem raises additional claims for trespass to land and for nuisance, but the gravamen of the claim and the sole basis for injunctive relief argued in its motion for preliminary injunction is a violation of FACE. Accordingly, these Defendants will focus their response on the FACE claim.

expressing their pro-life and Christian message on a matter of public concern orally, through the use of signs, and via leafleting.

Public sidewalks and public ways, of course, "occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). Rather than respect and protect these Defendants' fundamental constitutional rights, however, carafem waited until the event was just about over, then sought and obtained a temporary restraining order on false pretenses and without notice to these Defendants. Worse still, the injunction, which was issued improvidently in the first place, reaches beyond the confines of FACE and infringes these Defendants' First Amendment right to communicate, as well as the right of willing patients and passersby to receive, the potentially life-saving information these Defendants are trying to provide. *See, e.g., Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 85-86 (1989) ("'[I]t is better to leave a few . . . noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper fruits,' for the 'right to receive information and ideas, regardless of their social worth, is fundamental to our free society.'") (Stevens, J., dissenting) (quoting *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 718 (1931) (quoting 4 Writings of James Madison 544 (1865)).

Although FACE purports to prohibit those who either "by force, threat of force, or physical obstruction . . . intentionally injure, intimidate, or interfere with" someone seeking or providing "reproductive health services" *because* that person is seeking or providing such services, §248(a), carafem's FACE claim seeks relief solely on the basis of alleged "physical obstruction."[2] Amended

---

[2] As such, the histrionics reflected in the hearsay allegations in the Davidson Declaration concerning the overreaction of some unnamed patients should be disregarded. Ms. Davidson claims to have attached statements (¶ 20), but no such statements were attached. There is no claim of threat of force, yet carafem gratuitously included an anonymous staff member's alleged fearful reaction and claim of adding security

4

Compl., (ECF 38), Count I. As against these Defendants, the only incident complained of occurred on Tuesday, July 26, 2022. Amended Compl, ¶¶ 21-29. Stripped of its inflammatory (and deceitful) rhetoric, the only allegations carafem brings against these Defendants is that on that morning they approached the entrance of the building housing carafem to speak with the police and inquire whether in fact the Tennessee trigger law (the Human Life Protection Act, SB 1257) had gone into effect, as they – and the police – believed had already occurred.[3]

In order to meet its burden of proof in showing a likelihood of prevailing on the merits, Carafem must first show that these Defendants *have* violated FACE in the past, and then that they *will* violate it again in the immediate future. *See*, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-106 (1983) (dismissing case for lack of standing because although past injury was established, the plaintiff was unable to show a likelihood of future injury); *Tolson v. Washburn*, No. 3:19-CV-00175, 2019 WL 1572931, at *7 (M.D. Tenn. Apr. 10, 2019) (the plaintiff "sufficiently stated

---

around her home. Carafem also put forth legal argument concerning threat of force. Mem. Supp. Mot. PI at 9-10. This argument is improper and should be stricken. Even in its Amended Complaint, filed *after* its motion for preliminary injunction, carafem has not alleged a violation of FACE by threat of force. These vague, unfounded, and improper allegations should be stricken from the record. In the same way, the self-serving assertion by Jane Doe that she "interpreted" OSA's signs as "designed to threaten and intimidate carafem staff and patients" is absurd on its face. Ex. A to Mot. to Seal, ¶ 4. Ms. Doe's wild speculation is entitled to no weight in this evidentiary proceeding.

   Moreover, it is difficult if not impossible to differentiate between a direct response to the benign approach of these Defendants to the entrance of the building simply to speak with police about what they perceived to be an urgent matter on the one hand, and an indirect response predicated upon the extreme and irrational directions of NAF personnel ordering a lockdown when no one had even entered the building. Any claim of interruption of medical procedures is due wholly to carafem's and NAF's extreme overreaction, not to the innocent actions of these Defendants. For example, the Declaration of Jane Doe states that carafem had adjusted its staffing hours, told them to be "on high alert," and then – surprise! – "[a]s a result, [Ms. Doe] felt extremely anxious and scared." Ex. A. to Mot. to Seal, ¶¶ 5-7. Again, even charitably read, carafem has failed to meet its high burden required to obtain the extraordinary remedy of an injunction.

[3] The Human Life Protection Act, criminalizes abortion in all but exceptional circumstances. By its terms, it becomes effective 30 days after "[t]he issuance of the judgment in any decision of the United States Supreme Court which overrules, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973), as modified by *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), thereby restoring to the

arguable claims for Eighth Amendment violations based on past events, but [failed to] establish that he will suffer irreparable injury in the future . . .”). Carafem fails on both counts.

**A.      Carafem has failed to show that these Defendants violated FACE.**

First, Carafem has failed to demonstrate a likelihood of prevailing on the claim that these Defendants engaged in physical obstruction. The only activity by these Defendants that could conceivably be construed as violative of FACE were those occurring on the morning of July 26, 2022. But the evidence, properly considered and closely examined – and the videotape which carafem itself introduced into evidence -- shows that none of these Defendants engaged in physical obstruction to intentionally injure, intimidate, or interfere with a single individual because that individual was seeking to obtain or provide “reproductive health services” (i.e., an abortion). Rather, these Defendants conscientiously avoided obstructing anyone, and in fact even took affirmative action to ask building security to stand aside in order not to obstruct the entrance.[4] Carafem’s hearsay evidence, inference, and innuendo is either flatly contradicted by the videotape evidence and Deputy Chief of Police Mullins himself or is inconsistent with the great weight of the evidence.

**1.      Operation Save America’s Foundations of Freedom Event.**

OSA’s “Foundations of Freedom” event in and around Nashville was entirely legitimate and largely educational. It included talks from OSA leaders and local pastors on topics such as “Building Strong Families in the Modern World” and “How to Share the Gospel and the Message of Life Effectively.” OSA encouraged attendees to bring their entire families, and hosted a cookout with testimony from OSA Youth. *See* Exhibit A, Declaration of Jason Storms, at ¶¶ 3-4; Ex. B,

---

[4]  In truth, the Providence Pavilion in which the Carafem clinic is located has three entrances, as reflected on the map available at Google Earth.

6

Decl. Bo Linham, at ¶¶ 3-4. The intent was to was to serve the local churches and ministries OSA was partnering with, namely Scott Hord with Scott Hord ministries and Bo Linam of Hope Beyond Abortion. Ex. A, Decl. Storms, at ¶ 5. OSA thought that these ministries had provided multiple venues that OSA believed were prime locations for sharing the gospel and distributing Christian and pro-life literature pieces and displaying signs. *Id.* OSA also hosted hands-on workshops, where OSA personnel taught best practices for peacefully ministering outside of abortion clinics. As part of this hands-on training, OSA organized outreaches at the Carafem abortion clinic. Ex. A at ¶4; Ex. B at ¶ 4; *see also* Schedule of Events, https://www.operationsaveamerica.org/event/osa-national-event-faith-and-freedom-nashville-tennessee-july-23rd-30th-details-tbd/.

The event was also intended to be a celebration of the end of abortion in Tennessee, as OSA leadership believed the Tennessee trigger law had gone into effect and no clinic was still performing abortions. *See* Ex. A, Decl. Storms, at ¶ 7; Ex. B, Decl. Linam, ¶ 6. In fact, OSA prominently stated on its website:

> **UPDATE:** With the overturn of *Roe v Wade,* Tennessee's trigger ban on abortion is set to take effect during the week we will be in Nashville! We believe this is God's providence in the timing of our event as we will be able to effectively pressure city and state leaders to ensure full enforcement of the ban, and seek to help close up loopholes in the legislation. The abortion clinics are currently closed in the Nashville area, we are rejoicing for this, but there is still much work to be done! Please be in prayer for strategic guidance as to how to best utilize our time and efforts in Tennessee!

*See* OSA website, https://www.operationsaveamerica.org/event/osa-national-event-faith-and-freedom-nashville-tennessee-july-23rd-30th-details-tbd/.

As part of its preparation and transparency, OSA proactively reached out to and met with Deputy Chief Mullins of the Mt. Juliet Police Department on July 21, 2022, in advance of the Foundations of Freedom event. They reviewed the plans with D.C. Mullins, including the location and dates of specific events. They also invited D.C. Mullins to attend their meetings. Ex. B, Decl,

7

Linam, ¶ 5; *see also* Ex. 1 to Decl. Storms, copy of OSA letter to police dated July 10, 2022 ("OSA Letter"). OSA went out of its way, as was its custom, to inform police of their plans and to assure them that they intended to respect and abide by the law. In fact, OSA required all its participants to "have pledged, in writing, to maintain a lawful, peaceful, non-violent and prayerful presence" and "to follow the instructions of the police immediately." OSA Letter, p. 3.

As a result of OSA's transparency and willingness to work with police, they were in regular contact with the Mt. Juliet Police Department and in particular with D.C. Mullins. True to their word, OSA informed D.C. Mullins whenever their plans changed, respectfully listened when D.C. Mullins spoke with them, and immediately complied when D.C. Mullins ordered them to leave the entrance to the building on July 26, 2022. In fact, so open was OSA about its plans and events that "the NAF team" attended the July 25, 2022 (and would have been welcome to attend any of the rallies or training sessions as well, for that matter). *See* Am. Compl., Ex. 2, Decl. Michelle Davidson, ¶ 6.

## 2. Carafem's evidence is insufficient to satisfy it's burden.

Carafem has submitted two declarations (three if we consider the Jane Doe Declaration) to support its claim. Neither suffices to show a likelihood of success on the merits against these Defendants. The first is from Pat Wheeler, Director of Security for carafem. *See* Am. Compl., Ex. 1 "Wheeler Decl."). The second is from Michelle Davidson, Security Director for National Abortion Federation. *See* Am. Compl., Ex. 2 ("Davidson Decl.").

### a. Events of July 26, 2022.

Despite their meeting "frequently" with National Abortion Federation (NAF) personnel, police officials, and even FBI analysts, conducting surveillance, and engaging in undercover infiltration, the declarations show little more initially except that on July 26 these Defendants

8

gathered on the public ways near the abortion clinic and engaged in run-of-the-mill expressive activity such as holding signs, speaking to passersby, and leafletting. Wheeler Decl., ECF 1-1, ¶ 7; Davidson Decl., ECF 1-2, ¶ 7.

Wheeler correctly recites that after several hours these Defendants approached the front entrance of the building. Ex. 1, ¶ 8; *see also* Ex. 2, ¶ 8. However, Wheeler then falsely claims that "Defendants Storms and Gallagher, among the group, refused to move from the front doors and blocked entrance and exit from the building for several minutes." *Id.*, ¶ 9. In fact, as even Deputy Chief Mullins admits in his After Action Report, "**a video uploaded to social media** and captured by MJPD **showed other patrons coming and going freely from the building with no obstruction.**" *See* Ex. D, copy of D.C. Mullins' Incident After Action Report at 2 (emphasis added) (available online at https://mjpdnews.org/2022/08/03/mt-juliet-police-release-after-action-report-of-police-response-in-regards-to-last-weeks-protest-activity-at-5002-crossing-circle/) (hereafter, "Mullins Report"); *see also* Ex. B to Davidson Suppl. Decl, referred to by D.C. Mullins, also available online at https://www.facebook.com/100005473300370/posts/pfbid02fM3xiPXH7Z7JWkr6hJB2scv3rXYPqA2EwrJaF2Uf6R5f1Cnf16R82fRFhFKWjzxal/?d=n).[5] Indeed, as Defendant Bo Linam testified, he and Defendant Coleman Boyd "made sure these people could easily gain entry or exit of the building" and at one point "**had to ask the building security to step aside so people could exit the building.**" *See* Ex. B, Decl. Linam, at ¶ 11; Ex. C, Decl. Coleman Boyd, at ¶ 11. Thus,

---

[5] The Mullins Report is of course hearsay, as is much of carafem's evidence. But in the context of a preliminary injunction hearing, consideration of hearsay evidence is permissible. *See, e.g., Patel v. AR Grp. Tennessee, LLC*, No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) ("In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence.") (citations omitted).

not only did these Defendants not obstruct the entrance, *they assisted in keeping the entrance unobstructed*. Ms. Davidson does not go as far as Wheeler in mischaracterizing the actions of these Defendants, but does falsely refer after the fact to their actions as a "blockade." Ex. 2, ¶ 11.

And this is the incident upon which the entirety of carafem's case against these Defendants is predicated.

Additionally, carafem falsely asserts in its Amended Complaint that OSA "surrounded" the security officers, that they "blocked entrance and exit from the building for several minutes," ¶ 22, and that they "refused to move from the front entrance to the building" and "prevented visitors . . . from entering the building." *Id.*, ¶ 25. These allegations are demonstrably false, and directly refuted not only by the testimony of Defendants Storms, Linam, and Boyd, but also by the statement of DC Mullins himself as well as the uncontradicted videotape of the incident. These Defendants promptly left the front of the entrance once they had achieved their goal of speaking with the police about the very real possibility that innocent children were being killed by carafem in violation of the Tennessee trigger law – literally a matter of life and death. *See* Ex. A, Decl. Storms, ¶¶ 8-12; Ex. B, Decl. Linam, ¶¶ 7-12; Ex. C, Decl. Boyd, ¶¶ 7-12. Carafem has misled this Court and obtained its TRO on false premises, to the great detriment of these Defendants and to the rule of law.

Moreover, the Davidson Declaration, cited in support of these blatant falsehoods, does not support the allegations. The paragraphs referred to simply say no such thing. Paragraph 8 of Davidson's declaration (cited in support of ¶ 25 of the Am. Compl., along with ¶¶ 9-12) states that "a group of men . . . began to approach the front entrance" and then identifies who the men were. *See* Davidson Decl., ¶ 8. Paragraph 9 states only that Davidson knew and recognized these individuals from past histories and the like. *Id.*, ¶ 9. Paragraph 10 states that someone contacted

law enforcement, that Carafem went into lock down, that "[l]aw enforcement engaged the individuals who were being blocked by security guards at the front entrance," and that Davidson was able to "confirm over 20 incidents of trespassing."[6] *Id.*, ¶ 10. Note that it does *not* say that *these Defendants* were blocking the entrance, but rather that they were *being blocked by security guards*. Davidson's paragraph 11 does not address obstruction at all, describing instead a "video of the defendants after the blockade." *Id.*, ¶ 11. (That video, linked to above, was in fact posted by OSA, showing once again that they have nothing to hide.) Similarly, Davidson's paragraph 12 likewise does not address physical obstruction, but merely states that they had received word from D.C. Mullins that OSA planned to return to the public ways – a constitutionally protected activity -- again the next day. *Id.*, ¶ 12. Thus, the incendiary allegations in paragraphs 22 and 25 are wholly unsupported in the sworn assertions in Davidson's declaration. In a case seeking and obtaining the extraordinary remedy of an injunction issued without notice to these Defendants, this is unsettling, to say the least.

When considered in the full context of the videotape, the Mullins Report, the utter inaction by carafem on July 26, July 27, and even July 28, together with the declarations of these Defendants, it is clear beyond peradventure that these Defendants did not physically obstruct anyone. Carafem has falsely represented the facts, and fails to meet its burden of showing any violation of FACE.[7]

_____

[6] It is unclear what constitutes "incidents of trespassing," and in any event it is irrelevant here. Davidson is not the property owner, did not have personal knowledge of any warning having been issued, and by her own testimony identified only seven (7) individuals approaching the entrance. Who the other thirteen (13) alleged "trespassers" were remains a mystery. In addition, despite boasting of conducting some seven (7) hours of "surveillance" (Davidson Decl., ¶ 7), Carafem has not seen fit to produce a single videotape depicting any of the alleged trespass, let alone obstruction.

[7] Wheeler doubles down on his false allegation of obstruction, stating again in ¶ 12 of his Declaration that these Defendants "refused to move from the front entrance to the building." ECF

11

To put a finer point on the matter, D.C. Mullins stated that after these events he returned to Carafem and spoke to both the security team and to management. He "asked if they [i.e. these Defendants] were doing anything unlawful, **and the office manager stated they were not**." Mullins Report at 2 (emphasis added). This concession amounts to an admission against interest by carafem itself, and should emphatically foreclose the matter once and for all. The fact that the entrance was not blocked was confirmed once again by D.C. Mullins when the police department was asked to respond to media inquiries. The media asked whether carafem had been "padlocked" and whether protestors blocked access to the building or were inside. "Deputy Chief Mullins confirmed with Captain Chandler that **no one 'padlocked' Carafem**, that **access to the building was not blocked**, **and** that **protestors never attempted to enter the building**." Mullins Report, p. 3 (emphasis added).

**The misunderstanding concerning the Tennessee trigger law.**

Moreover, as D.C. Mullins and these Defendants explained, the only reason they approached the entrance in the first place was because of a misunderstanding concerning whether the so-called Tennessee trigger law had gone into effect, which would have effectively closed carafem's business. Even D.C. Mullins was confused about the trigger law, and consulted the District Attorney General to obtain clarification. These Defendants were concerned that the trigger law had gone into effect (which D.C. Mullins believed as well before this event), and that the police were not enforcing the law. *See* Ex. A, Decl. Storms, ¶¶ 7-9; Ex. B, Decl. Linam, ¶¶ 6, 7, and 9; Ex. C, Decl. Boyd, ¶¶ 6-9. D.C. Mullins went so far as to state in his report under paragraph

---

14, ¶ 12. Again, this falsehood is directly contradicted by D.C. Mullins, the videotape evidence, and the testimony of these Defendants. As D.C. Mullins wrote, "He then ordered them to leave the property. **Leadership then left the property**." *See* Mullins Report at 2 (emphasis added). Wheeler's allegations are untrustworthy and discredited; these blatant misrepresentations cast doubt on Wheeler's credibility in general.

15, "Critique," that: "Confusion regarding the trigger law should have been clarified prior to the event. However, **it was the belief of most law enforcement involved, that the trigger law was already in effect.** Verification of information still needed to be obtained." Mullins Report, p. 5 (emphasis added). These concerns were legitimate, and furthermore were in furtherance of enforcing the law, not breaking it.

Once these Defendants learned that the trigger law had not in fact gone into effect they stood down and took no further action toward enforcing it. *See* Storms Decl., ¶¶ 17-19. In fact, it appears to have been these Defendants' concerns and pressing of the matter that led the Supreme Court to issue the judgment in *Dobbs v. Jackson Women's Health Organization* – which occurred within hours of their raising the issue. *Id.* Once it was clear what the law was, these Defendants "unanimously agreed that no further action was needed by OSA, that carafem appeared to be operating within the bounds of the law, and there was nothing left to be done about it but let the trigger law go into effect in due time." *Id.* at ¶ 19. There was never any basis to charge these Defendants with violating FACE under these circumstances. For carafem, it appears that no good deed by a pro-life advocate can go unpunished.

The sincerity and legitimacy of these Defendants' response to the matter is underscored by their actions the very next day. On July 27, 2022, a group of them returned to the public ways outside carafem, and engaged in perfectly legal, constitutionally protected expressive activities. *See* Storms Decl, ¶ 20; Decl. Linam, ¶ 15; Mullins Report, p. 3. Indeed, D.C. Mullins' entry for that day consists of one short paragraph, and with respect to action states only: "At 0945, a small group of OSA members left the 5002 Crossing Circle and went towards Providence Market Place to hand out literature. **No incidents were encountered**." *Id.* (emphasis added). Even the crack

13

NAF undercover team and all their network of informants were unable to detect any "incidents of trespassing" or other suspected illegal activity. It was a quiet day.[8]

Wheeler's claim that D.C. Mullins related that these Defendants intended to return each day and "planned to 'escalate' activities and 'fill the hallways'" (ECF 14, ¶ 14) is similarly grossly distorted. Setting aside for the moment the double hearsay of the representation, it is curious, to say the least, that carafem claims to have felt threatened by these Defendants and their intentions **on July 26**, but took no action whatsoever **until July 29**, when the Operation Save America conference was practically over. Carafem's inaction belies any real fear of harm, even if Wheeler's assertions were factual, which they are not. In truth, while these Defendants did plan to return to the public ways, they never intended to "escalate" their activities (whatever that means), or to "fill the hallways." And the Mullins Report does not corroborate Wheeler's representations. What D.C. Mullins stated was simply that "Jason Storm (sic) as well as another unknown member of OSA's leadership, made a statement that they had the men that were willing to go in and stop the killing of children, if needed, but they hoped that law enforcement would handle it instead." Mullins Report, p. 3. That is a far cry from the barely recognizable distortion by Wheeler.

The comments by Storms and others were simply expressions of frustration at the unexpected developments regarding the trigger law. No actions were taken by OSA or anyone affiliated with OSA other than to respectfully but firmly inquire whether the trigger law was in effect and whether the police were going to enforce it if it was in effect. Nothing was said about

---

[8]  Perhaps sensing the weakness of its FACE claim, carafem has now filed an eleventh hour Amended Complaint raising new claims and adding new defendants. One of the new claims, Count V, asserts nuisance premised on, inter alia, the sound of crying babies. *See* Am. Compl., ¶¶ 61-63. Carafem alleges in ¶ 32 that some patients were "visibly upset" by the sound. What this reaction demonstrates is not that the sound created a nuisance, but that the real objection to these Defendants' activities is their message, not their methods. Expectant mothers hearing the sound of crying babies were likely overwhelmed with guilt at what they were about to do to their own unborn children.

14

"escalating" or "filling the hallways," and certainly no such actions were undertaken by OSA or these Defendants. Again, had Carafem genuinely been concerned on July 26, they would have commenced this lawsuit then, not waited until July 29, after all the public events at the clinic had ended. In short, these Defendants did not violate FACE or threaten a violation of FACE.

### b. The events of July 27.

Tellingly, Wheeler's Declaration omits entirely any mention of the events of July 27, skipping instead to the sudden arrival of Rickey and Bevelyn Williams and Edmee Chavannes on July 28. *See* Wheeler Decl., ¶¶ 15-16. Similarly, Davidson's declaration says little about the events of July 27, other than to say that a few "protestors" returned to the public ways outside carafem and then left to join the larger group at City Hall. Davidson Decl., ¶¶ 13-15. As shown below, the Williams group was not affiliated with OSA, had no part in the planning of OSA's activities, and cannot be lumped together with OSA in this action. Carafem has tacitly acknowledged this separation in its Amended Complaint, naming the Williams' ministry, At The Well, as a separate defendant.

Wheeler devotes the rest of his declaration to the activities of the Williams group, not even bothering to mention these Defendants. *Id*. Davidson makes scant mention of these Defendants as well, concentrating almost entirely on the Williams group. Carafem's claim that they "understood" the Williams group to be affiliates of OSA is insufficient as a matter of law to bind these Defendants, especially in the face of the unequivocal sworn declarations of Defendants Linam, Boyd, and Storm.

### 2. The Williams Group was not Affiliated with These Defendants.

The real crux of this case is carafem's attempt to lump these Defendants in with the Williams Group, whose actions were arguably more serious than those of these Defendants. But

the mere suggestion that they were associated in the past is woefully inadequate to enjoin these Defendants here.

As shown in the Declarations of Jason Storms, Bo Linam, and Coleman Boyd, Bevelyn Williams, Rickey Williams, and Edmee Chavannes are not members of OSA, played no role in planning the Foundations of Freedom events, and took no part in the events themselves, other than to show up unexpectedly for a short period at the City Hall outreach on July 27, as did hundreds of others. *See* Storms Decl, ¶ 21 (the Williams Group had no "involvement whatsoever with OSA and our Foundations of Freedom event"); Decl. Linam, ¶ 16 (Williams Group was "not included in any planning, either for the Foundations of Freedom event, or for individual outreaches; Linam does not even know them); Decl. Boyd, ¶ 15 ("none of them was involved in any planning, participation in, or even coordination with OSA and its Foundations of Freedom event"). The actions of the Williams Group "were in no way endorsed or sanctioned by OSA." Decl. Storms, ¶ 21; *see also* Decl. Linam, ¶ 16 (their actions "were in no way endorsed, influenced, or sanctioned by OSA"); Decl. Boyd, ¶ 15 (same).

That the Williams Group was not affiliated with OSA is also reflected in the detailed Mullins Report, by virtue of the fact that there is no mention of them whatsoever until they were ordered to leave the building on July 28. *See* Mullins Report, p. 3. In fact, D.C. Mullins asked carafem for information about them, indicating that he had not met them or seen them or interacted with them previously. *Id.* In addition, even the news reporter who routinely covers carafem and abortion stories, Hannah Herner, wrote that the TRO entered on July 29 had been issued against OSA, "including six of its members **and three additional activists**." *See* Hannah Herner, "Carafem Files Restraining Order Against Anti-Abortion Activists," Nashville Scene, Aug. 2, 2022, available online at https://www.nashvillescene.com/news/pithinthewind/carafem-files-

16

restraining-order-against-anti-abortion-activists/article_5e752af6-11e2-11ed-bc3e-af859fad5fd5.html (emphasis added).[9] Later in that same article, linked on carafem's website, Ms. Herner writes: ". . . On July 28, **three protestors not formally affiliated with OSA** entered the medical building and proceeded to Carafem's office . . ." *Id.* (emphasis added).

Furthermore, as shown on the schedule of events posted on OSA's website and in the Mullins Report, OSA initially had no plans to return to carafem after the July 27 outreach, although that changed in light of the fact that carafem was still open and apparently still offering abortions. Even so, OSA notified D.C. Mullins the evening of July 27 that some of them would return to carafem on the morning of July 28. *See* Mullins Report, p. 3. The actions of the Williams Group later that day, July 28, occurred after most if not all of the OSA team had already left the carafem location.

Again, on July 29, 2022, D.C. Mullins' Report shows that "[n]o incidents occurred," and he gives only brief coverage of the events. *See* Ex. D, Mullins Report, at 4. D.C. Mullins reported that "all protestors left the scene by 1300." *Id.* There were no further events scheduled at carafem, there had been no incidents by these Defendants since July 26 (and none worth mentioning even then), yet carafem swooped into Court only after these Defendants had concluded their lawful expressive activities and were leaving town, grossly misrepresented the facts, and obtained a TRO without notice.

---

[9]   That Ms. Herner routinely covers carafem and abortion clinics is shown on her web page, https://www.nashvillescene.com/users/profile/hannah%20herner/, with other stories such as "Interest in Male Birth Control Rises Following Roe Reversal," "Crisis Pregnancy Centers Tout Choice — Except When It Comes to Abortion," and "Planned Parenthood Stops Offering Abortions in Tennessee" written by Ms. Herner.

17

### 3.      Carafem's additional evidence.

Neither do the after-the-fact social media posts appended to the Supplemental Declaration of Davidson add any real substance to carafem's case against these Defendants. They are at best vague statements about undefined actions at some distant time in the future, and are insufficient as a matter of law to warrant issuance of the extraordinary remedy of a preliminary injunction. For example, she extracts a quote from Jason Storms saying that OSA has "no plans to keep up the protests" – which one would think would be welcome news to Ms. Davidson – but that more "activities" are planned for after August 25. Id., ¶ 7a. Again, this vague reference to more activities – which in all likelihood would be perfectly lawful activities such as those that took place the week of July 23 -- at some distant time in the future does nothing to strengthen carafem's case. Similarly, Matt Brock's post about what might happen "**if** the trigger law is in effect, **and** you're not going to enforce the law, we have people here who will enforce the law" (id. at ¶ 7d.) is altogether hypothetical and disproven by OSA's actions in standing down after D.C. Mullins clarified the state of the law. There is, again, no substance to the allegation and speculation of Ms. Davidson.

The only basis for any concern whatsoever is an out-of-context offhand comment by Chet Gallagher to D.C. Mullins concerning his personal consideration of a "rescue." See Mullins Report, p. 3 (stating that Mr. Gallagher told him a rescue would be likely between July 28 and August 25). Mr. Gallagher is not a part of these Defendants. His comment to D.C. Mullins was made in an offhand manner and was made solely in his personal capacity. As Mr. Storms has made clear, OSA had no intention of engaging in a rescue (blockade/sit-in), and he has himself never participated in a rescue, nor has any of his leadership team, including Matt Brock. Decl. Storms, ¶ 9. Whether Mr. Gallagher was simply thinking out loud or was privately making plans, history has shown that no rescue ever occurred (and this brief is being submitted on August 25). And Mr.

18

Storms and OSA leadership could not be clearer that the response of D.C. Mullins and the clarification of the trigger law's status resulted in a unanimous decision "that no further action was needed by OSA, that carafem appeared to be operating within the bounds of the law, and there was nothing left to be done about it but let the trigger law go into effect in due time." *Id.*, ¶ 19.

Under these facts, carafem has not shown that it is likely to succeed on the merits. Indeed, it has failed to show that these Defendants violated *any* law, let alone the FACE Act. These Defendants have been falsely charged, smeared with innuendo and guilt by association, and should not be subject to the further injustice of an injunction. Carafem's motion fails for inability to show any likelihood of succeeding on the merits.

## III. Carafem's Legal Position is Deeply Flawed, Cites Bad and Inapposite Law, and Fails to Meet Its High Burden.

Remarkably, carafem not only asserts argument on claims not put forth in its Amended Complaint, it also cites bad law. For example, it cites *New York v. Griepp*, 991 F.3d 81, 106 (2d Cir. 2021) – a case in which counsel for these Defendants appeared – for the proposition that FACE "prohibits *attempted* obstruction, not just actual obstruction." Mem. Supp. PI at 11 (emphasis in original). That opinion, issued March 10, 2021, **was vacated in its entirety** by a subsequent opinion by the same panel. *See New York by James v. Griepp*, 11 F.4th 174, 177 (2d Cir. Aug. 26, 2021) ("The defendants asked us to rehear the case. **We granted their petitions for rehearing and vacated our prior opinion**." (citing *Griepp*, 997 F.3d at 1258)) (emphasis added). It is decidedly and emphatically **not** the law that "attempted obstruction" is prohibited by FACE.

Similarly, many of the cases cited by carafem are relatively antiquated in the context of FACE cases, and have been questioned, distinguished, or modified by subsequent cases. For example, carafem cites *New York v. Cain*, 418 F. Supp. 2d 457, 480 n.18 (S.D.N.Y. 2006) for the proposition that even a "temporary obstruction" violates FACE. Mem. Supp. PI at 10. But again,

the *Griepp* case addressed that very issue, and distinguished *Cain* on that point. Indeed, the district court's 103 page opinion in *Griepp* was affirmed in its entirety by the Second Circuit after all appeals had been exhausted. *See New York v. Griepp*, 11 F.4th 174, 178. The district court carefully and thoughtfully distinguished *Cain* as well as *People v. Kraeger*, 160 F.Supp.2d 360, 367 (N.D.N.Y. 2001), also relied upon by carafem. (Mem. Supp. PI at 13). *See generally New York by Underwood v. Griepp*, No. 17-CV-3706 (CBA), 2018 WL 3518527 (E.D.N.Y. July 20, 2018); *see also id.* at *32 (discussing *Cain* and distinguishing between intentional and inadvertent contact); *id.* at *33 (discussing *Cain's* failure to find FACE violation because plaintiffs failed to satisfy "the statute's second intent element").

## IV.     Carafem Fails to Show Imminent Threat of Irreparable Injury.

As all the world knows by now, there is no longer any federal right to abortion. The entire edifice on which the FACE Act and similar laws were erected has been decimated by the Supreme Court's opinion in *Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228, 2284 (2022) ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and *Casey* arrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives.").

Injunctions must be supported by a showing of irreparable injury. This is the most critical component of a motion for preliminary injunction. *D.T. v. Sumner Cnty. Schs*., 942 F.3d at 327 ("[T]he existence of an irreparable injury is mandatory."). Yet carafem asks this Court **to simply presume the existence of irreparable injury**. Mem. Supp. PI at 15 (citing *U.S. v. Roach*, 947 F. Supp. 872, 877 (E.D. Pa. 1996) ("statutory provision authorizing preliminary injunctive relief may be an adequate substitute for a finding of irreparable injury to the plaintiff"). Carafem understandably omitted the citations in that quote, because those citations, and a quick

20

shepardizing of the cases, reveals that it is bad law. One of the citations in *Roach* was to a Third Circuit decision, *Government of the Virgin Islands v. Virgin Islands Paving, Inc*., 714 F.2d 283, 286 (3d Cir.1983) (citing *United States Postal Service v. Beamish*, 466 F.2d 804 (3d Cir.1972)). But in a subsequent Third Circuit decision, *Nat. Res. Def. Council v. Texaco Ref. & Mktg., Inc.*, 906 F.2d 934, 937 (3d Cir. 1990), the court recognizing the Supreme Court's impliedly overruling *Beamish* and its progeny in *Weinberger v. Romero–Barcelo*, 456 U.S. 305 (1982), and *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987), which held that irreparable harm may *not* be presumed absent explicit Congressional direction set forth in the statute at issue.

*Weinberger* clarified that an injunction, being an equitable remedy, "is not a remedy which issues as of course," or "to restrain an act the injurious consequences of which are merely trifling. An injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." 456 U.S. 305, 311-12 (cleaned up; citations omitted). "The Court has repeatedly held that **the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies**." *Id*. (emphasis added; citations omitted). In *Amoco Prod. Co*., the High Court directly addressed the question of presuming irreparable injury: "This presumption is contrary to traditional equitable principles" and had no place in the statutory scheme there at issue. 480 U.S. 531, 545.

This Court has likewise been called upon to address the issue: "A court is not automatically required to issue injunctive relief merely because the plaintiff has demonstrated a violation of the law and a risk of future violations." *Tennessee Clean Water Network v. Tennessee Valley Auth*., 273 F. Supp. 3d 775, 843–44 (M.D. Tenn. 2017) (opinion by Crenshaw, J.) (citing *Weinberger*).

There is a reason why carafem suggested the Court presume irreparable harm: because without a constitutional "right" to abortion, any harm to carafem is legal, not equitable, and its

21

basis for seeking an injunction vanishes. There is no constitutional right to "reproductive health services" apart from abortion. Thus, there is no irreparable harm to carafem. Carafem tries to salvage its claim of irreparable harm by selective citation to cases such as *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 372-373 (1997). See Mem. Supp. PI at 15-16. But *Schenck* and the other cases carafem cites, which loosely use the euphemism of "reproductive health services" in place of abortion, cannot save carafem here.

As a threshold matter, not a single woman was denied "reproductive health services," however broadly defined, by these Defendants. Nor was a single patient or other individual physically obstructed from entering the building housing carafem. The facts are indisputable. When carafem deceptively asserts that "Defendants repeatedly obstructed the entrance, common areas, and suite doorway of carafem" (Mem. at 15), it impermissibly (a) assumes that these Defendants ever obstructed any entrance, which they did not, and (b) lumps all Defendants together in a classic – and unconstitutional – "guilt-by-association" move. "'Guilt by association alone' . . . is an impermissible basis upon which to deny First Amendment rights." *Healy v. James*, 408 U.S. 169, 186 (1972) (citation omitted); *see also United States v. Robel*, 389 U.S. 258, 264-65 (1967) (finding that "guilt by association alone," even in the name of national defense, violates the First Amendment). It is undisputed that the only incident in which these Defendants were involved occurred on the morning of July 26. As shown above, the great weight of the evidence, and the unedited videotape which carafem itself introduced into evidence, proves that these Defendants obstructed no one. If anything, they should be rewarded for clearing the way for those seeking to enter the building when the security guards obstructed access.

Additionally, it is at least arguable that the FACE Act itself is now unconstitutional. It was enacted to protect abortion. *See, e.g., Am. Life League, Inc. v. Reno*, 47 F.3d 642, 647 (4th Cir.

22

1995) (observing that FACE was enacted for the purpose of "protecting women when they exercise their constitutional right to choose an abortion"); *People of State of New York ex rel. Spitzer v. Kraeger*, 160 F. Supp. 2d 360, 374, 376, 380 (N.D.N.Y. 2001) (noting government's legitimate interest in passing the FACE Act is the right of women to have an abortion as outlined in *Roe*). But without a constitutional right to abortion, the purpose of FACE and the need to protect access to clinic entrances is at best questionable.

Moreover, the FACE Act is arguably unconstitutional under the viewpoint discrimination analysis of *McCullen v.* Coakley, 573 U.S. 464 (2014) and *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Together, these cases render the constitutionality of FACE dubious. *McCullen* emphasized the "'special position in terms of First Amendment protection'" that the public sidewalks occupy "because of their historic role as sites for discussion and debate." *McCullen*, 573 U.S. at 476 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). It also highlighted the importance of the First Amendment right to express disfavored views on the public ways, noting "the First Amendment's purpose 'to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" *Id*. (quoting *FCC v. League of Women Voters of Cal*., 468 U.S. 364, 377 (1984)). *McCullen* went on to observe that "[t]he Act would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id.* at 2531 (quoting *League of Women Voters*, *supra*, 468 U.S. 364, 383). And if "speech outside . . . abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give . . . a content-neutral justification to restrict the speech." *Id.* at 479. Although the Court found the law content-neutral, three Justices indicated in a concurrence that they would have found the law content-based, and

one went so far as to declare it viewpoint-based. *See id.* at 503 (opinion by Scalia, J., joined by Kennedy and Thomas, JJ.); *id.* at 511 (opinion of Alito, J.).

One year later, in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Supreme Court ruled unconstitutional a sign ordinance because it was content-based. The Court set forth in detail a new analytical framework for determining whether a law is content-based or not "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. If the law on its face "draws distinctions based on the message a speaker conveys," it is content-based. *Id.* (citations omitted).

By its terms, FACE applies only against those whose motivation is to deter or dissuade someone from "obtaining or providing reproductive health services." Accordingly, it does not apply against clinic escorts or counter-protestors, like Jezebel's Rebellion. So, if a pro-life advocate steps in front of a clinic escort and thereby engages in "physical obstruction" with the intent to "interfere with" the escort because she is assisting in providing "reproductive health services," the pro-life advocate violates FACE. But if a clinic escort engages in **the identical behavior** by purposely stepping in front of a pro-life counselor, she does **not** violate FACE, because she is not acting with the requisite intent to interfere with the obtaining or providing of reproductive health services. In other words, by design and effect FACE operates only against those on the pro-life side of the issue. It is constitutionally significant that the intent of FACE was not to prevent *all* blockades of abortion clinics, but *only those undertaken by pro-life advocates*. In order to determine whether an act violates FACE, it is necessary to examine the content of the message or discern the intent of the actor, just as it was in *Reed*. FACE is therefore content-based.

Accordingly, carafem can neither prevail on the merits nor establish irreparable injury, thus dooming its motion to failure.

24

**V.    The Balance of Harms and the Public Interest Favor These Defendants.**

The remaining two factors in the preliminary injunction analysis, balance of harms and the public interest, favor these Defendants, not carafem. Defendants' conduct was at all times within the bounds of the law. Carafem will no longer be permitted to offer abortion services at this location, and consequently the desire of these Defendants to return to carafem is greatly lessened. Moreover, the activities of these Defendants constitute quintessential First Amendment protected activity. Carafem's injunction infringes those precious First Amendment rights. Upholding constitutional rights is always in the public interest. By contrast, by not issuing the injunction there would be minimal or no harm to carafem's business. These Defendants did not impermissibly interfere during the Foundations event, and there is no evidence they would do so in the future. Nor can carafem establish evidence of any concrete and imminent plans for these Defendants to return at some specific date in the future. Carafem's claim is too speculative: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).

Finally, the injunction as crafted by carafem impermissibly infringes these Defendants' rights and is overbroad under FACE, even if it had been properly obtained. It enjoins not only physical obstruction, but also "intimidating, injuring or interfering with any person." But FACE does not prohibit "intimidating" or "interfering" in the abstract. It prohibits only intimidating or interfering **by the use of force, threat of force, or physical obstruction**. 18 U.S.C. § 248(a)(1) (emphasis added). Carafem has improperly untethered the terms "intimidating" and "interfering" from the anchor of the use of force, threat of force, or physical obstruction, thereby creating a free-floating weapon by which to suppress protected speech in a public forum. This it may not do.

25

**CONCLUSION**

For all the foregoing reasons, this Court should deny carafem's motion for preliminary injunction.

Respectfully submitted this 25th day of August, 2022.

/s/Stephen M. Crampton
Stephen M. Crampton
Senior Counsel
Thomas More Society
P.O. Box 4506
Tupelo, MS 38803
scrampton@thomasmoresociety.org
662-255-9439


Larry L. Crain, Esq.
5214 Maryland Way
Suite 402
Brentwood, TN 37027
Voice: (615) 376-2600
Fax: (615) 376-2626
Mobile: (615) 300-3767
larry@crainlaw.legal
www.crainlaw.legal

*Counsel for Defendants Operation Save America, Jason Storms, Matthew Brock, Coleman Boyd, Frank "Bo" Linam, and Brent Buckely*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2022, the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, and that a copy of the foregoing will be sent electronically to all counsel of record by operation of the Court's CM/ECF system.

s/Stephen M. Crampton
Stephen M. Crampton
